CHARLES SWANSON, Appellee, v. S. E. SEELANDER, Appellant.

**LANDLORD AND TENANT:** Construction of Lease—Cancellation—Damages—Evidence. Where a lease of farm lands provided that, if lessor sold the property, the lessee agreed to move off the premises "by the lessor giving the lessee one year's notice or otherwise as may be agreed upon the payment of $500 in cash by the lessor," *held* that the evidence sustained the finding of the trial court that the parties interpreted the contract in accordance with the claim of the lessee that he was to receive $500 as damages if the lessor sold the farm, or if he was required to move off without a sale, and not that he could only receive damages if he did not have a year's notice before he was required to move.

*Appeal from Webster District Court.*—R. M. WRIGHT, Judge.

MARCH 14, 1919.

ACTION to recover $500, which plaintiff, appellee, claims is due from defendant, because he, plaintiff, as a tenant, vacated 240 acres of land, pursuant to the terms of a writ-

ten contract. Plaintiff asked a reformation of the contract, which was denied, but the court rendered judgment against the defendant for $500, and defendant appeals.— *Affirmed.*

*Healy & Faville,* for appellant.

,, *B. B. Burnquist,* for appellee.

PRESTON, J.—The plaintiff's claim is that he rented the land in question of one Johnson, for five years from March 1, 1913. The written lease contained the following provision: '

"In case the first party desires to sell said property, and has a purchaser for the same, the said second party agrees to relinquish all his rights in said lease and move off said premises, by first party giving second party one year's notice or otherwise as may be agreed upon by the payment of $500 in cash by first party."

Plaintiff further claims that the parties hereto, at all times, put a practical interpretation upon said clause, to the effect that, if the said Johnson, or his assignee, should sell the property during the lease, or plaintiff was required to move off the premises, plaintiff should be paid the sum of $500 in cash, as damages for the cancellation of the lease; that, in August, 1914, Johnson sold the premises to defendant, Seelander; and that, after plaintiff had occupied the premises for a period of nearly one year after the ownership of Seelander, he was ordered and directed to move from said premises, under the terms of the lease; and, pursuant to said order and notice, plaintiff did move therefrom, and demanded from both parties the payment of said $500; that both parties have, at times, agreed to pay said $500, but have failed to do so; that defendant, Seelander, took the premises when he purchased the same, with full notice of the lease and the terms thereof, and with full notice of the interpretation and meaning which plaintiff

and Johnson placed upon said clause; and that defendant, Seelander, took the premises subject to the lease, and subject to the interpretation placed thereon. By amendment to the petition, plaintiff alleged that the contract was ambiguous, and asked that it be reformed so as to conform to the meaning and interpretation placed thereon by the parties, including the defendant. The amendment also asks for judgment for $500, and general equitable relief. The answer denies all allegations of the petition not admitted. Defendant admits the execution of the lease, the purchase by defendant of the premises from Johnson, in August, 1914; that plaintiff remained upon the premises, and that thereafter he moved therefrom at the request and upon the solicitation of said defendant; that he knew of the existence of the lease at the time of and before he purchased the land; and that he purchased the premises subject to the lease. Appellant contends that the meaning of the clause in question is that the landowner had the right to terminate the lease by giving one year's notice; if he did not give one year's notice to terminate, it could be terminated by paying Swanson $500, and such shorter notice as might be agreed upon.

The trial court might well have reformed the lease; but without reformation, we think that, under the evidence and the interpretation given to it by all the parties, it is susceptible of the construction given it by the trial court, and that such construction should be given to it.

Appellant contends that plaintiff, as a witness, construed the clause substantially in accordance with appellant's contention; but counsel for either party claim for their clients that, because they are Swedes, they did not always express themselves clearly in the English language. In regard to plaintiff's testimony, before referred to, his counsel claim that the reporter did not correctly take down his answer, and, as we understand it, an application was

made to correct the record; but that is not very material now. However this may be, it is quite clear that plaintiff, at the time of the making of the lease, and before defendant bought the land, and at all times, interpreted the contract in the way he now contends for, and as the trial court interpreted it. Indeed, everyone who had to do with giving a meaning to the language quoted, with the possible exception of Chalgren, seemed to have so construed the contract. The defendant himself, as a witness,—though, in different parts of his testimony, he denies it,—yet, taking his evidence altogether, substantially concedes that he so construed and understood the contract, before purchasing the land. He was called as a witness by plaintiff. His evidence is somewhat evasive and contradictory. We shall set out a part of it. He says:

"I am pastor of the Lutheran Church. Have known plaintiff for 20 years. Swanson's wife is related by marriage to my wife. In May, 1914, I went to see the farm, and saw the plaintiff and his wife at that time; Mr. Swanson showed me the lease at that time. Swanson said to me, in the field, 'I understand you intend to buy the farm.' Q. Yes? A. Probably. Q. Yes, sir? A. And he said, 'Well, then, I will have $500.' Q. If you bought it? A. Yes. Q. Oh, that is what he said? A. Yes. Q. He said that the provision in that lease was— He said the provision in that lease was that it would cost you $500 if you bought the farm? A. Well, he said— Q. You don't mean that, do you? You don't mean to swear to this court, do you, that he told you, if you bought this farm, you would have to pay him $500 for buying it, do you? A. No. Q. What Mr. Swanson told you was that, if you bought the farm, if you had him move off, you would have to pay him $500, didn't he? A. No, no. Q. Well, what did he say? A. Yes, sure. He didn't say it would cost me $500 to buy the farm. He said, 'There is $500 coming to me.' I went out there before I

bought the place, and when he showed me the lease, he told
me that, under that lease, if Johnson or I had him move
off, that either I or Johnson would have to pay him $500.
Q. Well, see if this was what was said. Swanson told you,
then, that, under the terms of this lease, that if Johnson or
you wanted possession of that farm, they would have to
give him a year's notice and pay him $500? A. No, no.
Q. Well, they would have to pay him $500? A. No, no.
He said, in accordance with the lease. He said, under this
lease, either I or Johnson would have to pay him $500 if
he moved off. Q. And Swanson told you, 'Well, that is
the meaning of that lease, and that is the meaning that
Johnson and I had,' didn't he? He talked, quarreled with
you at that time? A. Yes; that is the meaning Swanson
had; yes. Q. Yes? He followed you out to your buggy, be-
fore you drove away, and told you that, if you bought the
farm 'under this lease, my claim is that Johnson—my claim
is that I get $500 if you make me move off,' didn't he?
That is the last thing he told you before you drove away?
A. Yes. In accordance with the contract. I had not bought
the land then. That was before I bought the land. He told
me that was his claim in accordance with the contract be-
fore I bought the land. That is, that he should get $500.
Elliott acted for his brother, Johnson, in closing the deal.
Q. Now, you had a talk with Elliott, before you closed the
deal, as to just what this provision in the lease meant,
didn't you? A. No. Q. Yes. You asked Mr. Elliott the ques-
tion as to what would happen, didn't you, if you should
buy the land and ask Swanson to get off, didn't you? You
talked about that with Elliott? A. No. I never mentioned
it to Elliott. Q. You had no talk with Elliott about that,—
you swear to that? A. No—not in that form you say.
Q. Well, I don't care what form it was in. A. Yes. But I
did talk with Elliott as to what would happen under this
lease if I should ask Swanson to get off. Elliott never

talked to me about the meaning. Swanson have several times, about the meaning. I do not pay any intention to their interpretation. Q. You did not care what Swanson told you about the interpretation before you went into this deal, did you? A. No, not a snap. April 6, 1915, I wrote Swanson a letter in the Swedish language, as follows: 'Because you wish that I shall answer immediately and let you know what I intend to do, and then I shall or just now answer your letter. And then in short I know it is a very probable thing, but that I intend to carry out the lease which exists between you and me. I don't mislike anything you say, because I understand that the lease is binding upon both parties; and here is the truth of the proverb that says that "who did not look up with his eyes, has to look out with his pocket book." Greetings from home to home. Friendly, S. E. Seelander.' I received a telegram from plaintiff's attorneys, December, 1915, saying, 'Do you refuse to pay $500 for possession of your farm March 1st? Wire answer immediately.' The answer I sent was that I received the telegram."

On cross-examination, he says he told plaintiff, in the earlier negotiations:

"It is not so sure that you have to move off the land if I buy the land. Swanson saying all the time has been that $500 would come to him. First, it was as he said, if the land was sold; but after that, after awhile he changed, and said if he should move off the land, $500 was coming to him. That has been his saying all the time since the beginning to the end. When we first talked about the lease, Swanson said that he was to get $500 from the mere fact that the land was sold. I told him that was not in the lease. I told him Chalgren said it was not in the lease. Then he came with his interpretation of the contract, and he said he was to get $500 if he moved off the place. I did not promise or agree

with Swanson that I would pay him $500 if he moved off
the land."

When asked how he understood the provision in the
lease before he bought the property, he said:

"I not put any meaning in the contract; the meaning
in the contract came to me what the contract says; I took
the meaning that stands in the contract."

The letter of April 6, 1915, was after defendant had
given plaintiff notice to vacate the premises, and was in
response to plaintiff's demand for the $500. Swanson testi-
fies that he told defendant, when he was looking over the
farm, that he had a five-year lease, and that "there is a part
of that lease that says, if I had to move before the term is
up, that I should receive $500." That Johnson so explained
the lease to him. That defendant then said, "If I buy this
farm, I buy it free from all incumbrances, and in this lease,
it says you people are going to have $500 if you have to
move off the farm;" and that, before he would buy the farm,
he would have an agreement with Johnson that he should
make plaintiff satisfied if he had to move off. That plain-
tiff then said, "That is the meaning of the lease." He says
that, later, he met defendant at Gowrie, and asked him how
he got along with the land deal, and that defendant said,
"Well, we got along pretty well; that the lease only amounts
to $500, and that don't worry me at all." Plaintiff after-
wards said to defendant, when defendant's son was plow-
ing:

"Now, your son is here plowing, and it seems to me
you have taken possession of the farm, and it is about time
you made some arrangement with that $500 that I have
got coming."

Defendant then said:

"Swanson, you can feel sure I am not going to beat
you out of them $500. Of course, I could just as well feel
that I could go in the bank and steal $500 as I can, accord-

cording to the law, beat you out of them $500. I will not do it."

Plaintiff says he demanded the $500 at that time. Mrs. Swanson corroborates her husband to some extent, as to the conversation between plaintiff and defendant. D. J. Elliott testifies that he is a brother of G. Emanuel Johnson's; that he closed the negotiations with defendant on behalf of his brother, the owner, in the sale of this land; that, during the negotiations, the lease was talked of between witness and defendant, as follows:

"A. The question came up as to whether Swanson should be asked to get off the property or not; so the question was asked Mr. Seelander by myself and Mr. Chalgren, who was assisting me in making the deal. Seelander was asked the direct question if he intended to ask Swanson to get off the land or not, and he said, 'No, I want Swanson to remain on the land.' Then I said, if Swanson is to leave the land at the request of G. Em. Johnson, G. Em. Johnson is to pay him $500 in cash; if Seelander purchases the land, which he does, subject to this lease, whenever he wants Swanson to get off the land, he must give him one year's notice and pay him $500 cash, if he is asked to get off the land prior to the expiration of the lease. Mr. Seelander said, 'I understand that to be so and I accept the proposition.' "

We have not attempted to give all the evidence, or all the contradictions, or circumstances affecting the weight and credibility of the different witnesses; nor have we attempted an analysis of the clause in question. We have attempted to set out enough of the testimony to show that all the parties, at about the time of the sale of the land, and before that, and for a time afterwards, interpreted the contract in accordance with plaintiff's claim and the finding of the trial court. The contract is, as before stated, susceptible of such construction.

The evidence does not vary the contract, but simply gives the construction which the parties have themselves placed upon language which is more or less ambiguous. The decree of the district court was right, and it is, therefore,—*Affirmed.*

Ladd, C. J., Evans and Salinger, JJ., concur.